# EXHIBIT A

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| KTD CORP. and DYMIN SYSTEMS, INC.<br>D/B/A THE WIRELESS GUYS,<br><br>    Plaintiffs,<br><br>vs.<br><br>NEXTEL PARTNERS, INC, NPCR, INC.<br>and DOUGLAS JAMES,<br><br>    Defendants. | LAW NO. CL101980<br><br><br><br>**PETITION AT LAW AND JURY<br>DEMAND** |

COMES NOW the Plaintiff, and for its cause of action, states:

1.    That at all times material hereto, the Plaintiffs are Iowa Corporations.

2.    That at all times material hereto, the Defendant, Nextel Partners, Inc. is a Delaware Corporation with its principal place of business in Kirkland, Washington.

3.    That at all times material hereto, the Defendant, NPCR, Inc. is a Delaware Corporation with its principal place of business in Kirkland, Washington.

4.    That at all times material hereto, the Defendant, Douglas James is a resident of Polk County, Iowa.

5.    That the Plaintiffs collectively, KTD Corp., Dymin Sytems, Inc. d/b/a The Wireless Guys, operate pursuant to an independent sale professional agreement by and between KTD Corp. d/b/a The Wireless Guys and NPCR, Inc. and Nextel Partners, Inc. dated March 20, 2003, which attached hereto and incorporated herein by this reference as Exhibit A.

6.    That at all times material hereto, Douglas James was and is an employee and authorized representative of the Defendants, Nextel Partners, Inc. and NPCR, Inc.



EXHIBIT

A

-1-

7.     That pursuant to the terms of the contract the Plaintiffs sold products with the corporate Defendants, Nextel Partners, Inc. and NPCR, Inc. in exchange for compensation more particularly specified in the contract attached hereto as Exhibit A.

8.     That outside the terms of the written contract, the Defendants, collectively, began to impose unauthorized charge backs and manual adjustments from the compensation calculations required pursuant to the terms of the contract.

9.     Additionally, the Defendants, and each of them, agreed either individually or through their authorized representatives that certain customers sold by Plaintiffs would be given certain inducements including but not limited to, zero dollar rate plans, phones at no charge and other inducements that the Defendants and each of them, failed to honor causing damage to the Plaintiffs' representative, business and good will.

10.     The Defendants and each of them, as a result of the foregoing demanded refunds for wrongfully withheld compensation due pursuant to the terms of the contract as well as demanded an inspection of the books, records and facilities of the Defendants pursuant to paragraph 19 of the contract by a letter dated May 23, 2006.

11.     Despite said request, the Defendants, and each of them, have refused to allow the Plaintiffs to inspect books, records and facilities pursuant to Paragraph 19 and further failed to refund the wrongfully withheld compensation pursuant to the terms of the contract.

12.     That the Defendants, and each of them, have sent the commission reports reflecting unauthorized deductions from Plaintiffs' compensation through the mails and or/over the wires in contravention of interstate commerce.

13.     That the Defendants, and each of them, have transmitted written correspondence and contracts identifying inducements offered to prospective customers obtained by the Plaintiffs through the mails and over the wires in contravention of interstate commerce.

14.     That the Defendants' transmission of said inducements through the mails and over the wires in contravention of interstate commerce occurred on more than three occasions.

### DIVISION I.  RACKETEERING INFLUENCE AND CORRUPT ORGANIZATION (RICO).

15.     Plaintiffs replead paragraphs 1 through 14 and incorporates them herein by this reference as if fully set forth herein.

16.     Plaintiffs are an enterprise engaged in interstate commerce as defined in 18 U.S.C. Section 1341 (1999).

17.     That the Defendants, and each of them, conspired to devise a scheme and artifice to defraud for obtaining money and property by means of false or fraudulent pretenses and representations from the Plaintiffs and for the purpose of executing such scheme or artifice or attempting to do so placed in the United States Post Office or authorized depository for mail matter in violation of 18 U.S.C., Section 1341 (1999).

18.     That Defendants, and each of them, conspired to devise a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, representations, or promises and transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, a writing, signal, sign, picture and/or sound for the purpose of executing such scheme or artifice in violation of 18 U.S.C., Section 1343 (1999).

19.     That the Defendants, and each of them, did on at least two separate occasions transmit false reports and information to the plaintiff's office utilizing the United States Postal

Service and/or wires traveling through telephonic communication by facsimile, or by E-mail.

20.     The Defendants, and each of them, conspired and did transmit through the United States Postal Service, and by wire utilizing telephonic and internet communication, false and fraudulent representations and promises under false or fraudulent pretenses, information to at least five different customers of the Plaintiff and directly to the Plaintiff.

21.     That the acts of the Defendants in perpetrating the aforementioned constitutes a pattern of racketeering activity in violation of 18 U.S.C.A., Section 1962 and 18 U.S.C.A., Section 1961.

22.     As a result of the Defendants' activities, the Plaintiffs have been damaged.

23.     That pursuant to Section 18 U.S.C., Section 1964, Plaintiffs are entitled to recovery from the Defendants three-fold the damages sustained and the costs of suit, including, reasonable attorneys' fees.

WHEREFORE, Plaintiffs respectfully request that the Court enter Orders consistent with the relief requested herein, including, but not limited to, entering judgment against the Defendants in an amount which will justly and equitably compensate them for the damages sustained as a result of the Defendants' activities, and further award Plaintiff's damages as allowed by law, and entering judgment for the costs of suit, including, but not limited, reasonable attorneys' fees and expenses, plus interest at the rate allowed by law from the date of filing, and for such and further relief as the Court deems equitable on the premises.

### DIVISION II.  BREACH OF CONTRACT

24.     Plaintiff repleads paragraphs 1 through 23 of Plaintiff's Petition and incorporates them herein by this reference as if fully set forth herein.

25.     That pursuant to the terms of the contract the plaintiffs sold defendant's products

to plaintiffs' customers.

26.     That pursuant to the terms of said contract certain payments were payable to plaintiffs by the defendants.

27.     That in addition, defendants agreed to provide certain inducements to some of plaintiffs customers.

28.     That despite the terms of the written agreement between plaintiffs and defendants, and written and verbal inducements offered to plaintiff's customers, the defendants and each of them, have breached  the terms of the agreements by failing to compensate plaintiffs in accordance with the agreement and not honoring inducements offered to plaintiff's customers.

29.     That as part of their agreement, the plaintiffs are entitled to inspect the books and records of the defendants, upon request, and defendants have breached that provision of the agreement by refusing to allow said inspection.

30.     That the Defendants, and each of them, breached the aforementioned terms of the agreement between the parties.

31.     That as a result of the breach, Plaintiff has suffered and continues to suffer damages, including but not limited to compensatory damages, damages to defendants business, reputation and goodwill.

32.     Defendants breach of the agreement was willful and wanton and in reckless disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages and attorneys fees.

WHEREFORE, Plaintiff respectfully requests that the Court enter a Judgment against the Defendants, and each of them, in an amount determined by the Court to be just and equitable on the premises and designed to fully compensate for the damages sustained by the Plaintiffs as a result of Defendants' actions, punitive damages and attorneys' fees, plus interest at the rate

allowed by law from the date of filing, and for such other and further relief as the Court deems equitable on the premises.

## DIVISION III.  FRAUDULENT MISREPRESENTATION.

33.     Plaintiffs replead paragraphs 1 through 32 of Plaintiff's Petition and incorporates herein by this reference as if fully set forth herein.

34.     That Defendants made statements unto the principals of the Plaintiffs, and plaintiff's customers, concerning certain inducements that would be given by defendants to some of plaintiff's potential customers.

35.     That Plaintiffs relied on the representations made by the Defendants and their reliance was justifiable.

36.     As a result of their representations, Plaintiffs conducted its business affairs and secured the business of plaintiff's customers relative to products offered by the defendants based on said representations.

37.     That Plaintiff's reliance on Defendants' representations was justifiable.

38.     That the representations made by the Defendants were false and material, and as a result of Plaintiff's representations of the Defendants, the Plaintiff has been damaged.

39.     That the representations made by the Defendants were willful and wanton and intentional and justified an award of punitive damages against the Defendants herein.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the Defendants herein in an amount calculated by the Court to fully compensate Plaintiffs for the damages sustained as a result of the wrongful acts of the Defendants, punitive damages, attorneys' fees, plus interest at the rate allowed by law from the date of filing, and for such other and further relief as the Court deems equitable on the premises.

## JURY DEMAND

COME NOW the Plaintiffs and hereby demand a trial by Jury.

Steven P. Brick   AT 0001084
BRICK, GENTRY, BOWERS, SWARTZ,
STOLTZE & LEVIS, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, Iowa 50266
Telephone: (515) 274-1450
Facsimile: (515) 274-1488


Christopher Spaulding  PK 1018026
BERG, ROUSE, SPAULDING & SCHMIDT,
P.L.C.
2423 Ingersoll Avenue
Des Moines, Iowa 50312
Telephone: (515) 277-6559
Facsimile: (515) 277-7536

ATTORNEYS FOR PLAINTIFFS

Original filed.

## AUTHORIZED INDEPENDENT SALES PROFESSIONAL AGREEMENT

THIS AGREEMENT ("Agreement") is entered into on this 20th day of March, 2003 by and between NPCR, Inc., a Delaware corporation having a business office and address at 6750 Westown Pkwy, Ste. 115 W. Des Moines, IA 50266, ("Company"), and KTD Corp. DBA The Wireless Guys, a Corporation ("ISP") whose principal business address is 413 Main St. Ames, IA 50010

A.      Together with affiliated companies, Company owns and / or operates a nationwide wireless communications network (the "Systems") that provides wireless data and voice communications services (the "Services") to qualified individuals and businesses who subscribe for such Services ("Customers"). It is essential to Company's business success and operations that Company representatives maintain professional, high-quality customer service and support; and,

B.      ISP is either familiar with Company's Systems and Services or is willing to receive the training necessary to become familiar with Company's Systems and Services and wishes to become an authorized independent sales professional for Company in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

### 1.      CONTRACT DOCUMENTS

This Authorized Independent Sales Professional Agreement includes the terms and conditions set forth in the following Sections, the ISP Program Rules (defined herein), and the Exhibits identified below, all of which are incorporated herein by this reference and made a part hereof (collectively, the "Agreement"). ISP acknowledges receipt of all of the documents that comprise this Agreement and agrees to be bound by their terms and conditions. References herein to this "Agreement" include the terms and conditions set forth below, the Exhibits, and the ISP Program Rules. The following Exhibits are attached hereto and made a part hereof:

| | |
|---|---|
| Exhibit A | Territory |
| Exhibit B | ISP Facility Locations |
| Exhibit C | Compensation Plan |
| Exhibit D | Bonus/Special Incentives |
| Exhibit E | Minimum Performance Requirements |

If there is any inconsistency between the documents that comprise this Agreement, the terms and conditions of the Sections set forth below shall take precedence over the Exhibits and the ISP Program Rules, and the Exhibits shall take precedence over the ISP Program Rules.

### 2.      AUTHORIZATION AND ACCEPTANCE

(a) Company hereby authorizes ISP to solicit subscriptions from qualified Customers for Services on the Systems in the Territory (hereinafter defined) subject to the terms and conditions of this Agreement. ISP hereby accepts such authorization upon the terms and conditions contained in this Agreement. ISP shall use its best efforts to enact and carry out sales and merchandising policies consistent with this Agreement that are designed to preserve and enhance the goodwill associated with the name and reputation of the Company and the Services. Company retains the right at all times and from time to time in its sole and absolute discretion: (i) to define the types of Services that may be sold, (ii) to establish the price for such Services, (iii) to dictate the qualifications a Customer must meet in order to subscribe to such Services, and (iii) to limit the number of Customers that may be loaded onto the Systems by ISP.

(b) ISP represents and warrants to Company that the execution and performance of this Agreement does not and will not violate any other contract or obligation to which ISP is a party, including terms relating to covenants not to compete, non-solicitation and confidentiality covenants. ISP will not disclose to Company, or use or induce Company to use, any proprietary information or trade secrets of any other person, association or entity. ISP represents and warrants that to the extent required to do so, it has returned all property and confidential in

EXHIBIT

A

belonging to all prior employers or service providers for whom ISP may have acted as a dealer or independent sales professional. ISP shall defend, indemnify and hold Company and its affiliated companies, and their directors, officers, employees, agents, successors, and assigns, harmless from any and all costs and expenses, losses, liabilities, damages, claims and demands of every kind, including any third-party liabilities and any court costs and reasonable attorneys' fees, arising out of or relating in any way to the breach of ISP's representations made in this Section 2(b).

## 3.   TERM

Upon execution of this Agreement by both parties and subject to the terms and conditions set forth herein, this Agreement shall commence on the date hereof and shall continue in full force and effect for an initial term of two (2) years (the "Initial Term") or until earlier terminated as provided herein. Provided that ISP is not in breach or default of this Agreement and is otherwise in good standing hereunder, ISP may request a one (1) year extension of this Agreement (the "Extension Term"). ISP must make any such extension request to Company in writing not more than 180 days and not less than 90 days before the expiration of the Initial Term.  No Extension Term shall commence unless Company, in its sole and absolute discretion, shall have consented in writing to the relevant extension request. In the event that the Initial Term (or Extension Term) of this Agreement shall have expired and no further Extension Term shall have been consented to in writing by Company, this Agreement shall automatically extend on a month to month basis and may thereafter be terminated by either party for any reason or no reason at all upon thirty (30) days prior written notice to the other party.

## 4.   TERRITORY

ISP is authorized to perform the solicitation, merchandizing and other activities permitted or required under this Agreement only in the geographic area set forth in **Exhibit A** (the "Territory"). Company reserves the right to modify the Territory from time to time or at any time upon prior notice to ISP. Company shall have no obligation under this Agreement to compensate ISP for subscriptions for Services from any Customer outside of the Territory.

## 5.   NON-EXCLUSIVE RELATIONSHIP

ISP's service as an ISP for the Company within the Territory is not on an exclusive basis.  ISP understands and agrees that Company may in its sole and absolute discretion enter into agreements with other ISPs in or outside of the Territory on similar terms contained in this Agreement or on any other terms; use its own direct sales force or retail outlets to solicit Customers in or outside of the Territory; offer exclusive territories to or make exclusive certain Customer bases for other ISPs or Company's direct sales force or retail outlets; and/or establish the number and type of ISPs permitted to sign up Customers in the Territory.

## 6.   SUB-CONTRACTORS

ISP may, with the prior written consent of Company, which consent may be granted or withheld in the Company's sole and absolute discretion, subcontract a portion of the responsibilities under this Agreement to one or more sub-contractors or independent agents (collectively "Sub-Contractors"), provided that any such Sub-Contractor agrees, in a written agreement in form and substance reasonably satisfactory to Company, to be bound by the provisions of this Agreement; and, provided further that ISP shall be fully responsible to Company for and shall indemnify and hold Company harmless against, any and all acts or omissions of any Sub-Contractor as if the Sub-Contractor were ISP.

## 7.   RESERVED ACCOUNTS

Company may at any time and from time to time in its sole and absolute discretion declare that certain accounts, certain account types, and/or certain Customers or potential Customers (e.g., government entities, large corporations) are reserved, and ISP shall not thereafter solicit or otherwise attempt to obtain subscriptions for Services from any such reserved account or Customer. Should ISP obtain any subscriptions for Services from any such reserved account, Company shall have no obligation to compensate ISP for such subscriptions. Company will make available to ISP a list of all reserved accounts (the "Reserved Account List") on a periodic basis.  ISP acknowledges that Company has provided ISP with the current Reserved Account List and that Company may update the Reserved Account List at any time and from time to time in its sole and absolute discretion.

8.   **NON-SOLICITATION AND COVENANT NOT TO COMPETE**

(a) Except in accordance with this Agreement, during the Initial Term and any Extension Term of this Agreement (including, without limitation, any month to month extensions), and for a period of one year following the expiration or termination of this Agreement for any reason, ISP hereby covenants and agrees that within the Territory it shall not: (i) market, solicit, advertise, promote, sell, service, or otherwise distribute any wireless communication device or service that incorporates, within a single wireless communication device, interconnected voice and/or data communication service on the one hand, and any dispatch or walkie-talkie service or feature that provides private one to one or one to many wireless voice and/or data communications on the other hand; and/or (ii) act as an employee, agent, representative, independent contractor, consultant or otherwise consult with, finance or help establish any other individual or business that markets, solicits, advertises, promotes, sells, services or otherwise distributes any wireless communication device or service that incorporates, within a single wireless communication device, interconnected voice and/or data communication service on the one hand, and any dispatch or walkie-talkie service or feature that provides private one to one or one to many wireless voice and/or data communications on the other hand.

(b) Except in accordance with this Agreement, during the Initial Term of this Agreement and any Extension Term (including, without limitation, any month to month extensions), and for a period of one year following the expiration or termination of the Agreement for any reason, ISP agrees not to solicit for any other wireless communications provider Customers or potential Customers of Company or Nextel Communications, Inc. or any of their respective subsidiaries or affiliates that were identified by Company during the Initial Term (or, if applicable, any Extension Term and any month to month extension) of this Agreement, or attempt to induce or induce any such Customers to terminate Service or not enter into Service agreements with Company or Nextel Communications, Inc. or any of their respective subsidiaries or affiliates. ISP acknowledges and agrees that any breach of this non-solicitation provision shall damage Company in an amount that is not easily quantified and, therefore, agrees to pay to Company upon demand as liquidated damages the sum of $1,000 for each violation of this non-solicitation provision that results in either of the following: (i) a Customer of Company or Nextel Communications, Inc. or any of their respective subsidiaries or affiliates terminating Service with Company or Nextel Communications, Inc. or any of their respective subsidiaries or affiliates; or (ii) a potential Customer of Company or Nextel Communications, Inc. or any of their respective subsidiaries or affiliates that was identified by Company during the Initial Term (or, if applicable, any Extension Term and any month to month extension) of the Agreement not subscribing to service with Company. The liquidated damages set forth in this Section 8(b) are in addition to and shall not limit or otherwise affect Company's ability to recover any and all other damages or to enforce any other remedy as a result of ISP's breach of this Agreement including, without limitation this non-solicitation provision.

(c) ISP acknowledges and agrees that the covenant not to compete and the non-solicitation provisions of this Section 8 are material and substantive provisions of this Agreement and that Company would not enter into this Agreement with ISP without the inclusion of these provisions. ISP acknowledges and agrees that any breach by ISP of these provisions will cause immediate and irreparable damage to Company in an amount that may not be easily calculated. As such, and in addition to any and all other rights, remedies and causes of action that Company may have for a breach of these provisions by ISP, and notwithstanding anything herein to the contrary, ISP acknowledges and agrees that upon a breach of these provisions by ISP, Company may immediately seek, in addition and without prejudice to all other rights, remedies and causes of action Company may have, injunctive or other equitable relief to enforce these provisions. ISP and Company acknowledge that by their express terms, the provisions of this section shall survive termination or expiration of this Agreement.

9.   **PLACE OF BUSINESS**

(a) During this Agreement, ISP shall maintain within the Territory one or more places of business (a "Facility") with at least one full time sales representative located at such Facility. ISP shall obtain Company's prior written approval of the location or relocation of each such Facility. The address of each Facility shall be set forth on **Exhibit B.** The Company makes no representations or warranties that the facilities of other ISPs, the Company's own retail facilities or the facilities used by any of the Company's own sales force, will not be in the same geographic proximity as the Facility of ISP.

(b) ISP agrees to maintain and operate each Facility in a professional, first class condition so as to promote and protect Company's business reputation and good will, including, without limitation, maintaining reasonable business hours consistent with other businesses in the general location of the Facility, properly staffing the Facility during such business hours, and maintaining a neat and professional environment in and around the Facility. If at any time Company believes that ISP is not operating and maintaining a Facility in compliance with this Agreement, Company shall provide written notice to ISP stating in reasonable detail the reasons why the Facility is not in compliance. ISP shall have ten (10) business days to remedy the non-compliance. If ISP fails to remedy the non-compliance within ten business days, Company, may, in addition and without prejudice to all other rights and remedies it has, immediately thereafter terminate ISPs right to use the Facility for any purpose under this Agreement and/or terminate this Agreement for cause and pursue any and all available remedies.

## 10.   CUSTOMER EQUIPMENT

ISP understands and acknowledges that Customers shall be entitled to access to the Systems only by using digital mobile radio units that have been furnished by or through or have been approved in writing by Company ("Customer Equipment").

## 11.   CUSTOMER EQUIPMENT PROGRAMMING, INSTALLATION AND MAINTENANCE

ISP shall not provide Customer Equipment programming, installation and maintenance services to Customers unless Company has approved ISP's Facilities as an authorized service center. Such approval may be granted in Company's sole and absolute discretion in accordance with the ISP Program Rules. If Company approves ISP as an authorized service center, ISP shall provide such services in accordance with all requirements, rules, and regulations of Company relating to Customer Equipment services, as those rules may be established or amended by Company from time to time, and ISP shall comply with all standards, procedures and manuals of the appropriate Customer Equipment manufacturer. If, in Company's sole and absolute discretion, ISP is not providing such Customer Equipment services in conformity with this Agreement and the applicable standards, rules and procedures, Company may revoke its approval of ISP's Facilities as an authorized service center, and ISP's right to provide Customer Equipment services shall be suspended until ISP's Facility again meets with Company approval. Customer Equipment services shall not be performed by anyone other than appropriately qualified ISP and/or Sub-Contractors and shall not be performed at any non-authorized Facility. If ISP's Facility has not been approved by Company as an authorized service center, ISP may arrange to have Customer Equipment installed and serviced by Company or any other authorized service center Facility at such rates as are then in effect. ISP's status as an authorized service center for Company shall terminate upon expiration or earlier termination of this Agreement or as otherwise provided in any other agreements between ISP and Company.

## 12.   RATE PLANS

(a) From time to time in its sole and absolute discretion, Company will establish one or more Service offers or rate plans that are available to qualified Customers ("Rate Plans"). Company will provide to ISP either orally or in writing the terms and conditions and other necessary information associated with available Rate Plans. The timing of the release of such information shall be in the Company's sole and absolute discretion. Company may provide sales and marketing material regarding any Rate Plan to ISP with or without charge in accordance with Section 18 of this Agreement.

(b) ISP shall quote and offer to Customers or potential Customers only the Rate Plans that have been established by Company and that are in effect at the time of such offer and shall not offer any discounts or rebates or otherwise alter, modify or amend any of the terms and conditions of the Rate Plans. ISP shall not knowingly offer or subscribe Customers to Rate Plans for which the Customer does not qualify. ISP shall not represent that Services may be obtained on terms and conditions different than those stated in the Rate Plans or grant any discount or make any adjustment to any rate, term or condition contained in a Rate Plan regarding the Services. If ISP (i) offers a Customer a Rate Plan that has expired or is no longer in effect; (ii) offers a Customer a Rate Plan for which the Customer does not qualify and the ISP knew or should have known that the Customer did not qualify; (iii) modifies, amends or otherwise changes any term or condition of a Rate Plan; (iv) offers a Customer a discount, adjustment or other service-related concession, and a Customer thereafter subscribes to Services based on such conduct or representation by ISP, Company may, in addition to any and all other rights and remedies it may have hereunder,

withhold or set off against any compensation owed to ISP under this Agreement or otherwise the amount of any damages, credits, lost revenue or uncollectible service charges Company incurs as a result of ISP's conduct.

(c) Company shall have the right at all times and from time to time in its sole and absolute discretion to: (i) establish the conditions, qualifications and limitations associated with any Rate Plan; (ii) modify or amend any Rate Plan or the conditions, qualifications and limitations associated therewith; (iii) terminate, suspend or discontinue any Rate Plan; (iv) add new Rate Plans; (v) limit or restrict the availability of any Rate Plan to only certain Customers, certain areas or certain distribution points; and (vi) establish, modify, amend, suspend or terminate any compensation associated with the activation of subscriptions to any Rate Plan. Company will use reasonable efforts to provide ISP with notice of changes to or cancellations of Rate Plans or the eligibility requirements associated with Rate Plans. However, in no event shall Company be restricted in its ability to add, delete, suspend, modify or otherwise amend its Rate Plans or the eligibility requirements associated therewith nor shall Company be liable to ISP for failing to provide ISP with such advance notice.

13.   **ISP PROGRAM RULES**

(a) Company has established policies and procedures for, among other things, activating, fulfilling and provisioning Services to Customers. These policies and procedures are set forth in more detail in the ISP Program Rules. The ISP Program Rules may also contain additional information and requirements, including, without limitation, activation procedures, appropriate forms, agreements and other materials to be used in order to properly activate an account, deposit and credit requirements, marketing and advertising procedures and support, use of demo equipment and Services, distribution of Sales Literature (defined below), Chargeback (defined herein) provisions for commissions and other compensation, and anti-fraud and security procedures. ISP hereby agrees to comply with the ISP Program Rules in effect from time to time. ISP has received a copy of the ISP Program rules currently in effect.

(b) Company may, in its sole and absolute discretion, at any time and from time to time, amend, modify or otherwise change the ISP Program Rules. Company will make reasonable efforts to provide ISP with advance notice of any changes to the ISP Program Rules; provided, however, that Company's failure to provide such notice will not in any way affect Company's right to amend, modify or otherwise change the ISP Program Rules nor will it affect ISP's obligation to comply with the ISP Program Rules when ISP receives notice of any such change. ISP acknowledges that its failure to comply with the ISP Program Rules that have been provided or made available to ISP may, at Company's option, result in the forfeiture of commissions or other payments due to ISP under this Agreement and/or termination of this Agreement for cause.

14.   **COMPENSATION OF ISP**

(a) Provided that ISP is in full compliance with this Agreement, and subject to Company's set off rights provided herein, Company shall pay ISP compensation for subscribing qualified Customers to Services on qualified Rate Plans in the amount and otherwise in accordance with **Exhibit C**. Company reserves the right to modify **Exhibit C** from time to time or at any time. Company will make reasonable efforts to provide ISP with fifteen (15) days prior notice of any changes to **Exhibit C**.

(b) From time to time after execution of this Agreement, Company may introduce additional Rate Plans, Services or features that are available for sale to Customers. Company may, in its sole and absolute discretion, make such additional Rate Plans, Services and features available to ISP for sale to qualified Customers pursuant to the terms and conditions of this Agreement and/or an addendum to this Agreement. Company shall have the right to establish any and all additional terms, conditions and/or compensation, including commissions, residuals and Spiffs (as defined below), if any, associated with the sale of such new Rate Plans, Services and features by ISP to qualified Customers. If ISP subscribes any Customer to any new Rate Plan, Services or features, ISP acknowledges and agrees that such activity shall be in conformity with this Agreement and any additional terms, conditions and compensation established by Company.

(c) In addition to the compensation set forth on **Exhibit C**, Company may at any time and from time to time, in its sole and absolute discretion, offer bonus programs and special incentives to ISP ("Spiffs"). ISP acknowledges and understands that Spiffs may or may not be offered and if offered may be offered for a limited time, may be conditioned on achieving certain production levels or tied to particular Rate Plans or otherwise contain special terms

and conditions that Company may establish in its sole and absolute discretion. ISP acknowledges and understands that Company may amend, modify, alter, terminate or suspend any Spiff at any time with or without notice to ISP; provided, however, Company will use reasonable efforts to provide ISP with notice of any Spiff and any modification, suspension or termination of any Spiff. If Company offers any Spiffs, the terms and conditions of the Spiff, including, without limitation, the amount and payment terms, will be provided to ISP in accordance with **Exhibit D**. All Spiffs shall be subject to full compliance with the terms and conditions of this Agreement, including, without limitation, Company's set off rights.

(d) Company's obligation to pay compensation to ISP under this Agreement and ISP's right to receive compensation, including, without limitation, commissions, residuals and Spiffs, shall automatically cease upon the occurrence of any of the following events with or without prior notice from Company:   (i) termination of this Agreement by Company for cause; (ii) termination of this Agreement by ISP for any reason; (iii) ISP's assignment or attempted assignment of this Agreement or the payments due under this Agreement without first obtaining Company's written consent; (iv) termination of this Agreement or refusal to renew this Agreement by Company or ISP for any reason or no reason at all after the Initial Term or any Extension Term has expired unless the parties have consented in writing to an Extension Term; or, (v) upon expiration of this Agreement by its terms.

(e) In the event this Agreement is terminated without cause during the Initial Term (or, if relevant, any Extension Term) by Company, and ISP is entitled to any residual payments as set forth on **Exhibit C**, Company shall have the option in its sole and absolute discretion to either: (i) continue paying ISP the residuals as they become due pursuant to this Agreement notwithstanding its termination; or (ii) pay ISP a one-time, lump sum payment consisting of the net present value of the stream of residual payments (the "Net Present Value Residual Payment") calculated as set forth below. The Net Present Value Residual Payment shall be calculated as follows:

(i) Company shall calculate the average of the qualifying monthly net revenue (as described on **Exhibit C**) for the three full months immediately preceding termination of the Agreement (the "Average Monthly Residual Revenue").

(ii) The Average Monthly Residual Revenue shall be multiplied by the lesser of: (x) the number of months for which residual payments are to be made as set forth on **Exhibit C**; and, (y) the number of months remaining in the Initial Term (or, if applicable, the Extension Term) of the Agreement. The result shall be the Gross Residual Revenue.

(iii) The Gross Residual Revenue shall be multiplied by the "Residual Churn Rate." The Residual Churn Rate, expressed as a percentage, shall be equal to the greater of: (x) the ISPs average monthly Churn Rate (as defined in **Exhibit E**) for the three months immediately preceding termination of the Agreement; and (y) the Company's average Churn Rate as reported in its most recent quarterly earnings release. The result obtained by multiplying the Gross Residual Revenue by the Residual Churn Rate shall equal the Gross Residual Payment.

(iv) The Gross Residual Payment shall be discounted to present value using the same number of months as was used to calculate the Gross Residual Revenue and a discount rate of 14%. The result shall be the Net Present Value Residual Payment.

## 15.   COMPANY SET OFF RIGHTS/RESERVES

(a) Company may at any time and from time to time without prior notice to ISP withhold compensation or other amounts due under this Agreement to ISP and set off such amounts against any and all amounts owed to Company by ISP, its subsidiaries, affiliates, employees, agents, representatives and Sub-Contractors, pursuant to this Agreement or any other agreement between the parties, including, without limitation, any amounts owed to Company because of a Chargeback (as defined in **Exhibit C**), unpaid demo phone balance or any other losses or damages suffered by Company as described in Section 12(b) or otherwise as a result, directly or indirectly, of ISP's breach of this Agreement.

(b) Upon expiration or termination of this Agreement by either party for any reason, Company shall be entitled at its option to establish and withhold a reserve from compensation or any other amounts owed to ISP under this Agreement or otherwise in the manner and amount set forth below (the "Reserve"). At all times following the

initial four full months of the Initial Term, the Reserve shall equal the average commission amount paid to ISP per each unit subscribed to Services during the immediately preceding four full months, multiplied by the number of Chargebacks incurred by ISP during the same four month period. Within the first four months of the Initial Term, the Reserve shall equal the greater of (i) the average commission amount paid to ISP per unit subscribed to Services during the length of the Agreement multiplied by the number of Chargebacks incurred by ISP during the same period, and (ii) $1,000. Company may use the Reserve to satisfy any obligations owed by ISP to Company or that Company may owe to any third party as a result of ISP's breach of this Agreement regardless of whether such obligations arose during or after the termination or expiration of this Agreement, including, without limitation, damages (liquidated or unliquidated) incurred by Company as a result of ISP's breach of any provision of this Agreement, Chargebacks, and any amounts that Company could otherwise set off against pursuant to Section 15(a). After the later to occur of (x) Company's satisfaction of any and all such obligations, and (y) one hundred eighty (180) days after termination or expiration of this Agreement, Company will remit the balance, if any, of the Reserve to ISP.

16.   **MINIMUM PERFORMANCE REQUIREMENTS**

**Exhibit E** sets for minimum performance requirements regarding the total number of subscriptions ISP must maintain on a monthly basis and the average churn rate that ISP must maintain in order to remain in compliance with this Agreement (the "Minimum Performance Requirements"). ISP shall comply with the Minimum Performance Requirements set forth on **Exhibit E** at all times. If ISP fails to comply with the Minimum Performance Requirements, Company may, in its sole and absolute discretion, terminate this Agreement for cause. Company may amend or modify the Minimum Performance Requirements upon thirty (30) days prior notice to ISP.

17.   **TRANSSHIPPING**

Without the prior written consent of Company, ISP shall not redirect or deliver Customer Equipment to a destination other than the destination located within the Territory associated with the Customer that has purchased Services and the associated Customer Equipment.

18.   **SALES LITERATURE/ISP ADVERTISING**

(a)  Company may make available a reasonable amount of coverage maps, and such other materials (collectively, the "Sales Literature") as may be necessary, proper, or convenient in the Company's sole judgment to assist ISP in its sales activities. Company may charge ISP for Sales Literature. ISP shall be under no obligation to purchase the Sales Literature.

(b)  Any Sales Literature, broadcast advertising or other materials employed by ISP in connection with the sale or offering for sale of any Services or Customer Equipment, that uses a trademark, service mark, copyright or other form of intellectual property owned by Company, Nextel Communications, Inc. or any of their respective vendors shall be submitted to Company or its designated representative for prior approval. Company may withhold approval of such Sales Literature, broadcast advertising and other materials prepared by ISP in Company's sole and absolute discretion.

(c)  Any and all written or broadcast advertising or promotion of Services prepared by ISP must receive Company's prior written approval.

(d)  All sales and marketing materials, including, without limitation, pamphlets, fliers, billboards, radio and TV advertisements, direct mail, Internet advertisements and all other advertisements prepared by ISP, regardless of whether such advertisements have been submitted to Company for prior approval: (i) shall present the Company, the Services and the Systems in a professional, high quality manner; (ii) shall be truthful, accurate and comply with all applicable rules, ordinances, regulations, laws and statutes, and (iii) shall otherwise be in accordance with this Agreement, including, without limitation any and all advertising guidelines established by Company from time to time.

## 19. INSPECTIONS: BOOKS, RECORDS AND FACILITIES

Company shall have the right at all times during business hours to inspect each Facility of ISP and to inspect, copy and make extracts of ISP's books and records as they pertain to ISP's performance of its obligations under this Agreement. ISP shall maintain all such books and records at the relevant Facility and for the greater of thirty-six (36) months after their creation or the period of time required by law for the maintenance of such records. ISP shall have the right to inspect Company's records as they pertain to Customers placed on the Systems by ISP on a day mutually agreed upon by ISP and Company once a year during the Initial Term or any Extension Term of this Agreement.

## 20. INDEPENDENT CONTRACTOR RELATIONSHIP

With respect to all matters relating to this Agreement, ISP shall be deemed to be an independent contractor, shall bear its own expenses in connection with this Agreement and shall have no express or implied right or authority to assume or create any obligation on behalf of Company. Nothing stated in this Agreement shall be construed as creating the relationships of employer and employee, franchiser and franchisee, master and servant, principal and agent, dealership, partnership or joint venture between Company and ISP. ISP shall not represent itself or its organization as having any relationship to Company other than that of an ISP for the limited purposes described in this Agreement. ISP shall not have, nor shall it hold itself out as having, the power to make contracts in the name of or binding on Company, nor shall it have the power to pledge credit or extend credit in the name of Company. Company reserves the right but not the obligation to withhold applicable state and federal taxes from any and all amounts owed to ISP under this Agreement if required by law to do so.

## 21. CONFIDENTIAL AND PROPRIETARY INFORMATION

(a) As used in this Agreement, Confidential Information means any information disclosed by or relating to Company that ISP obtains in connection with this Agreement or otherwise including, without limitation, sales techniques and methods, sales techniques and methods related to the Direct Connect Service, sales training materials, manuals, forms and other such information, advertising, promotion and marketing techniques and materials, pricing strategies and promotions, Customer referral or testimonial programs, product information, information regarding new or proposed Services or Customer Equipment, information regarding alliances or agreements with other service or product providers, new data applications, new data products or services, customized products, services or data applications, Services and business manuals, installation and maintenance techniques, sources, vendors or suppliers of materials, insurance information, credit policies, Customer and prospective Customer lists, and all other information regarding Customers or prospective Customers, the Services, the Customer Equipment, and the Systems whether of a technical, business or other nature that generally is not known to the public. Confidential Information may be contained in tangible materials, such as drawings, models, data, specifications, reports, compilations and computer programs, or may be in the nature of unwritten knowledge.

(b) ISP hereby covenants and agrees that Company has developed all Confidential Information ISP acquires during its association with Company through substantial expenditures of time, effort and money and constitutes valuable and unique property of Company. ISP hereby agrees that it will use all such Confidential Information only in the performance of its duties and obligations under and in strict compliance with the terms and conditions of this Agreement. ISP agrees that any use of the Confidential Information other than as set forth in this Agreement shall be a breach of this Agreement and shall, at Company's option and in addition to any and all other rights, remedies and causes of action the Company may have, result in immediate termination of this Agreement for cause.

(c) ISP specifically acknowledges and agrees that: (i) all Confidential Information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of ISP and whether compiled by Company and/or ISP, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use; (ii) Company has made reasonable efforts to maintain the secrecy of such Confidential Information; and (iii) such Confidential Information is the sole property of Company and that any retention and use of such Confidential Information by ISP during the term of this Agreement (except in the course of performing its duties and obligations hereunder) or after

the termination or expiration of this Agreement shall constitute a misappropriation of Company's trade secrets and/or property.

(d) ISP covenants and agrees that it will keep the Confidential Information in confidence and, except as expressly provided in this Agreement, will not disclose it to anyone without Company's prior written consent. ISP will not use, or permit others to use, Confidential Information for any purpose other than in accordance with performing its obligations under this Agreement. ISP shall not make any unauthorized copy, of any kind, of any Confidential Information and will use its best efforts to avoid disclosure, dissemination or unauthorized use of Confidential Information. ISP shall implement and maintain procedures described from time to time by Company to prevent unauthorized use and disclosure of Confidential Information.

(e) The provisions of this Section 21 will not apply to any Confidential Information that (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been properly obtained or known to ISP at the time of its receipt from Company; (iii) is rightfully received from a third party who did not acquire or disclose such information by a wrongful or tortious act; or (iv) can be shown by documentation to have been, independently developed by ISP without reference to any Confidential Information.

(f) ISP immediately will return all tangible material embodying Confidential Information (in any form and including, without limitation, all summaries, copies and excerpts of Confidential Information) upon the earlier of (i) the termination or expiration of this Agreement and (ii) Company's request.

(g) ISP acknowledges and agrees that disclosure or use of Confidential Information in violation of this Agreement will cause irreparable harm to Company for which monetary damages may be difficult to ascertain or an inadequate remedy. ISP therefore agrees that Company will have the right, in addition to its other rights and remedies and notwithstanding anything herein to the contrary, to seek and obtain injunctive relief for any violation of the confidentiality obligations set forth in this Section 21.

22.   **ISP'S OTHER OBLIGATIONS**

(a) ISP, for itself and its agents, representatives, Sub-Contractors and employees, agrees to conduct any and all activities in connection with this Agreement in a lawful manner, consistent with the highest standards of fair trade, fair competition and business ethics.

(b) ISP shall be responsible for all of the costs of its business, including, but not limited to, travel, entertainment, office, clerical, accounting, and general selling expenses and any and all expenses of its employees, Sub-Contractors, agents and representatives. In this connection, ISP shall be solely responsible for the preparation and submission to applicable authorities of its employees' income tax and FICA forms and the payment of all salaries to employees, employer contributions and employee benefits. ISP represents and warrants to Company that ISP holds all licenses and permits necessary for conducting its business.

23.   **TRADEMARKS AND COPYRIGHTS**

ISP shall not acquire any right to goodwill, trademark, copyright, or other form of intellectual or commercial property of Company or Nextel Communications, Inc. ISP shall not use Company's or Nextel Communication, Inc.'s trademarks, service marks or logotypes in any manner in connection with this Agreement or the sale of the Services, except that during the Initial Term (or, if applicable, any Extension Term and any month to month extension) of this Agreement ISP may identify itself as an independent sales professional for Company provided Company has given prior written approval to all such identifications. ISP acknowledges and agrees that the name "NEXTEL" "NEXTEL PARTNERS" or the name of any of Company's affiliates (or the registered fictitious name of such) and all marks and logos used by Company and/or Nextel Communications, Inc. are service marks and trademarks (collectively "Trademarks") belonging solely to Company, Nextel Communications, Inc. and/or their respective affiliates, and that ISP shall not use the same to identify its business or use the Trademarks in its advertising, without the prior written consent of Company which consent may be withheld in Company's sole and absolute discretion.

## 24.   TERMINATION

(a) <u>Termination without Cause</u>. This Agreement may be terminated by either party hereto without cause and for any reason or no reason at all during the Initial Term (or, if relevant, any Extension Term and any month-to-month extension) upon thirty (30) days prior written notice to the other party.

(b) <u>Immediate Termination for Cause</u>. In addition to all other rights and remedies available to Company under this Agreement, Company may, in its sole and absolute discretion, modify this Agreement or terminate this Agreement for cause immediately upon the occurrence of any of the following events:

(i) ISP's cessation of business, election to dissolve, dissolution, insolvency, failure in business, commission of an act of bankruptcy, receivership, general assignment for the benefit of creditors, or filing of any petition in bankruptcy or for relief under the provisions of the bankruptcy laws;

(ii) ISP makes a material misrepresentation or omission to Company or to a Customer concerning ISP, a Customer, Company, the Services, or Systems;

(iii) ISP attempts to subscribe or subscribes unauthorized Customer Equipment on the Systems;

(iv) ISP resells or rents any Services without written authorization from Company;

(v) ISP submits false or misleading information to Company or attempts to deceive or deceives the Company with respect to any of ISP's obligations or actions under this Agreement, including but not limited to the intentional disconnection and reconnection of Customers or units for the purpose of receiving a commission or other compensation under this Agreement, attempting to subscribe or subscribing a unit or a Customer for Services for which the ISP knows the Customer does not qualify or for which the ISP knows the Customer does not want, attempting to activate Services for a fictitious Customer or for a Customer based on false or misleading information concerning that Customer including that Customer's credit-worthiness, attempting to subscribe a Customer for Services or subscribing a Customer for Services based on false or misleading statements made to the Customer by the ISP, and aggregating activations with other ISPs or Sub-Contractors;

(vi) ISP recruits or accepts Customers from unauthorized persons including, without limitation, sub-agents, Sub-Contractors and subdealers;

(vii) ISP recruits, solicits or otherwise attempts to hire any person employed by Company without the prior written consent of Company which consent may be withheld in Company's sole and absolute discretion; or,

(viii) ISP breaches any provision of Sections 2(b), 6, 7, 8, 11, 12(b), 16, 17, 18(b)(c)(d), 21, 23 and/or 33.

(c) <u>Termination for Cause after Notice and Opportunity to Cure</u>. In addition to all other rights and remedies available to Company under this Agreement, Company may, in its sole and absolute discretion, modify this Agreement or terminate this Agreement for cause as follows:

(i) ISP's failure to pay any amount due Company under this Agreement within ten (10) days after notice has been given that such payment is overdue; or,

(ii) ISP's failure to cure any breach of this Agreement within ten (10) days after receipt of written notice from Company that such breach has occurred other than those breaches described in Section 24(b) above or elsewhere in this Agreement for which immediate termination for cause is expressly provided.

### 25.    INSURANCE

ISP shall provide and maintain at its own expense the following insurance against liability arising in any way out of this Agreement and any other insurance coverages which may be deemed necessary by Company: (i) General Public Liability insurance with a combined single limit of $1,000,000; (ii) Workers' Compensation and Employers Liability insurance sufficient and proper under the laws of the state wherein the responsibilities are to be performed to protect Company against claims under the compensation laws of said state; (iii) Automobile Public Liability insurance covering all vehicles used in connection with the Agreement with a combined limit of $1,000,000; (iv) fire, theft, and extended coverage with respect to the Customer Equipment in ISP's possession in an amount no less than the replacement value of such Customer Equipment. All insurance policies shall be in companies satisfactory to Company, name Company as an additional named insured, and contain a waiver of subrogation clause whereby the insurer waives all rights of subrogation it may have under such policies as related to Company. Each insurance policy will contain a clause requiring the insurer to give Company at least thirty (30) days prior written notice of any alteration in the terms of such policy or the cancellation thereof. ISP will promptly provide Company with written notice thereof and make available to Company all information and documentation relating thereto.

### 26.    RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon the termination or expiration of this Agreement, the parties hereto agree that ISP shall immediately cease using and shall deliver (or return, as applicable) to Company, without retaining copies: (a) any unused Sales Literature; (b) all lists of Customers, books, records and other information supplied to, developed or maintained by ISP pertaining to Customers or prospective Customers, and otherwise pursuant to its exercise of its rights and performance of its obligations under this Agreement; and (c) all forms, directives, policy manuals, Confidential Information and other written information and materials supplied to it by Company pursuant to this Agreement or which contain Company's trademarks or service marks. Furthermore, ISP shall immediately cease to identify itself as an independent sales professional for, or authorized representative of the Company and/or Services and shall remove all signage from any place of operation that contains any such designation.

### 27.    FORCE MAJEURE

Company shall not be liable for any loss, damage, delay or failure to perform in whole or in part resulting from causes beyond Company's control, including, but not limited to, war, acts of terrorism, fires, earthquakes, other natural disasters, strikes, delays in transportation, or requirements of any governmental authority.

### 28.    WAIVER OF CERTAIN DAMAGES

EXCEPT WITH RESPECT TO A CLAIM BROUGHT BY COMPANY THAT ARISES OUT OF A BREACH OR VIOLATION BY ISP OF SECTIONS 8 AND/OR 21 OF THIS AGREEMENT, NEITHER PARTY TO THIS AGREEMENT SHALL BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION, LOST PROFITS OR OTHER MONETARY LOSS, ARISING OUT OF OR IN ANY WAY RELATED TO THE PARTY'S ACTS OR OMMISIONS IN CONNECTION WITH THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT, THE PERFORMANCE OR LACK OF PERFORMANCE OF THE SERVICES OR THE SYSTEMS, WHETHER OR NOT ANY SUCH MATTERS OR CAUSES OF ACTION ARE WITHIN THE PARTY'S CONTROL OR DUE TO NEGLIGENCE OR FAULT ON THE PART OF THE RESPECTIVE PARTY, ITS AGENTS, AFFILIATES, EMPLOYEES OR OTHER REPRESENTATIVES AND REGARDLESS OF HOW ANY SUCH CLAIM ARISES, WHETHER AS A TORT, BREACH OF CONTRACT, IN LAW OR AT EQUITY OR OTHERWISE. NOTHING IN THIS PROVISION SHALL LIMIT, MODIFY OR ELIMINATE COMPANY'S RIGHTS TO INJUNCTIVE RELIEF AND SET OFF CONTAINED IN THIS AGREEMENT.

### 29.    INDEMNIFICATION

ISP shall indemnify, defend and hold Company, its officers, directors, representatives, agents and assignees harmless against any liability for any claims arising out of any act or omission of ISP, its officers, directors, representatives, agents, Sub-Contrators and employees under or with respect to this Agreement. For purposes of this

indemnification, "claims" means and includes all claims, causes of action, losses, liabilities, damages or other obligations, such as taxes in connection with business conducted or sales made by ISP, actual and consequential damages, and out-of-pocket costs reasonably incurred in the defense of any claim, such as accountants', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, travel and living expenses. Company shall have the right to defend any such claim against it. This indemnity shall continue in effect even after, and notwithstanding, this Agreement's expiration or termination.

### 30.  APPLICABLE LAW

This Agreement and the rights and liabilities of the parties shall be governed in accordance with the laws of the State of Washington.

### 31.  ENTIRE AGREEMENT

This Agreement sets forth the entire agreement between the parties concerning the subject hereof, and supersedes all prior and contemporaneous written or oral negotiations and agreements between them concerning the subject matter hereof.

### 32.  WAIVER

The failure of either party at any time to require the performance by the other party of any provision of this Agreement shall not affect in any way the right to require such performance at any later time nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of such provision.

### 33.  ASSIGNMENT

Company may freely assign this Agreement to any successor of it or to any other firm or entity capable of performing its obligations hereunder. Company has entered into this Agreement in reliance upon the financial, business and personal reputation of ISP and its management. Therefore, neither this Agreement, nor any right or obligation of ISP hereunder shall be transferred, assigned or encumbered by ISP without Company's prior written consent, which consent may be withheld in Company's sole and absolute discretion. Any purported transfer, assignment or encumbrance without such consent shall be void and shall be grounds for immediate termination of this Agreement by Company with cause. Subject to the restrictions against assignment herein provided, this Agreement shall bind and inure to the benefit of the successors and assigns of the parties hereto.

### 34.  NOTICE

Any notice or other written communication required or permitted to be given by this Agreement shall be delivered by personal delivery, by certified mail or first class mail, or by reliable overnight carrier, properly addressed pursuant to this Section, and shall be deemed given when personally delivered, three (3) business days after it has been mailed, or one (1) day after it has been sent by reliable overnight carrier. All such notices shall be addressed as follows:

If to Company:

6750 Westown Pkwy, Ste. 115
W. Des Moines, IA  50266

With a copy to:

Nextel Partners, Inc.
4500 Carillon Point
Kirkland, WA  98033
Attention:  Legal Department

If to ISP:

413 Main St.
Ames, IA 50010

Either party may change the notice address listed above by giving notice to the other party as indicated in this Section.

35.   **SEVERABILITY**

If any provision of this Agreement is determined to be invalid or unenforceable, the provision shall be deemed to be severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

36.   **REGULATORY COMPLIANCE**

This Agreement shall be subject to all necessary approvals of local, state and federal regulatory agencies having jurisdiction over the provision of Services. If any provision of this Agreement does not comply with any law, ordinance or regulation of any regulatory authority, such provision shall to the extent possible be interpreted in such a manner as to comply with such law, ordinance or regulation, or if such interpretation is not possible, it shall be deemed amended to satisfy the minimum requirements thereof.

37.   **ARBITRATION**

Other than with respect to Companies right to seek equitable relief for a breach or violation by ISP of Sections 8 and 21 of this Agreement, all disputes, claims and other causes of action (including, without limitation, any counterclaims and cross-claims) between ISP and Company arising out of or in any way related to this Agreement, regardless of whether any such dispute, claim or cause of action sounds in tort or contract, shall be resolved by binding arbitration, at the request of either party, in accordance with the rules of the American Arbitration Association. A panel of three arbitrators, one selected by Company, one by ISP and the third selected by the first two arbitrators so selected shall conduct the arbitration. The arbitration shall be held in Seattle, Washington or such other location as shall be mutually agreed to by the Company and ISP. The arbitration panel shall, upon the concurrence of at least a majority of its members, have the authority to render an appropriate decision or award, including the power to grant all legal and equitable remedies and award compensatory damages provided by the law in the State of Washington and consistent with the terms of this Agreement but shall have no power to award punitive damages. The arbitrators shall prepare in writing and provide to the parties an award including factual findings and the reasons on which the decision is based. The decision of the arbitrators shall be final and unreviewable for error of law or legal reasoning of any kind and may be enforced in any court having jurisdiction of the parties. The parties shall each bear one-half of the cost of the arbitration proceeding (including the fees and expenses of the arbitrators) and all of their own (and their advisors') expenses of participation in the arbitration.

38.   **WAIVER OF JURY TRIAL**

EACH OF THE PARTIES HERETO HEREBY WAIVES IRREVOCABLY ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS AND RELATIONSHIP CONTEMPLATED HEREBY.

THIS AGREEMENT SHALL NOT BE EFFECTIVE UNLESS ALL EXHIBITS ARE ATTACHED AND INITIALED BY THE COMPANY'S VICE PRESIDENT OF MARKETING OR MANAGER OF INDIRECT MARKETING.

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first above written.

COMPANY:

NPCR, Inc.,

By: _____

Printed Name: Perry Satterlee

Title: COO

ISP:

KTD Corp DBA The Wireless Guys,

By: _____

Printed Name: Kamal Habhab

Title: Owner

Midwest Exhibits
CONFIDENTIAL

**EXHIBIT A**
**TO**
**AUTHORIZED INDEPENDENT SALES PROFESSIONAL AGREEMENT**

**TERRITORY**

ISP may solicit Customers located in the following geographic locations:

Iowa
Minnesota
Nebraska
North Dakota
South Dakota
Wisconsin
Illinois areas supported by the employees of the Midwest region of Company (local market may provide more specific information about the specific geographic locations comprising these areas)

The Company shall have no obligation to compensate ISP for any Customers acquired outside of the identified Territory or in areas where Company does not hold the license to provide Service. The Company may, in its sole discretion, expand or modify the Territory at any time and from time to time.
**ISP acknowledges and agrees that notwithstanding the Territories listed above, it shall not solicit or sign up Customers or potential Customers in areas or locations in which Company does not have the right to provide Service.**

ISP initials: _____                    Company initials: _____